J-A02027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: A.C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 990 WDA 2024 |

Appeal from the Decree Entered July 11, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
32B in Adoption 2024

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF J.G.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 991 WDA 2024 |

Appeal from the Decree Entered July 11, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
32A in Adoption 2024

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: E.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 992 WDA 2024 |

Appeal from the Decree Entered July 11, 2024
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
32 in Adoption 2024

BEFORE:  KUNSELMAN, J., MURRAY, J., and BECK, J.

J-A02027-25

MEMORANDUM BY MURRAY, J.:                    **FILED: March 19, 2025**

J.M.B. (Father) appeals from the orphans' court's decrees granting the petitions filed by Erie County Office of Children and Youth (OCY or Agency), involuntarily terminating Father's parental rights to his children, E.M.B. (a son born in July 2017), J.G.B. (a son born in October 2018), and A.C.B. (a daughter born in February 2023) (collectively, Children). Counsel for Father, W. Charles Sacco, Esquire (Counsel), has filed a petition to withdraw from representation and a brief pursuant **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).[1] After careful review, we grant Counsel leave to withdraw and affirm the orphans' court's decrees.

Father and K.L.B. (Mother)[2] (collectively, Parents) are the biological parents of Children. On June 26, 2023, Children were removed from Parents' care by means of an emergency protective order. The dependency court adjudicated Children dependent on July 17, 2023, based on, *inter alia*, Parents' history of involvement with OCY, domestic abuse, and abuse of alcohol/drugs.

---

[1] **See also In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004) (explaining that the **Anders** procedure for withdrawal of court-appointed counsel has been extended to appeals involving the termination of parental rights).

[2] The orphans' court also involuntarily terminated Mother's parental rights to Children. Mother separately appealed the termination orders at Nos. 896, 897 and 898 WDA 2024.

The dependency court originally set the permanency goal for Children as reunification. The dependency court conducted review hearings on October 25, 2023, December 14, 2023, and February 26, 2024. After the review hearing on October 25, 2023, the dependency court added a concurrent permanency goal of adoption. Following the review hearing on February 26, 2024, the dependency court changed the permanency goal for each child solely to adoption. Dependency Court Orders, 2/26/24.

Relevant to this appeal, on March 19, 2024, OCY filed petitions for the termination of Father's parental rights as to Children based, in part, on his failure to meet any of the goals set by OCY. OCY's goals required Father to

1. Refrain from the use of drugs and/or alcohol and submit to random urinalysis testing through the color code system at Esper Treatment Center.

2. Participate in Drug and Alcohol services, of which include Erie County Office of Drug and Alcohol and Safe Harbor Behavioral Health[,] and follow all recommendations.

3. Participate in [a] mental health assessment, follow all recommendations, and be able to demonstrate continuous mental health stability.

4. Obtain/maintain safe and stable housing conditions with proof to the Agency via signed lease agreement.

5. Obtain/maintain gainful employment and/or other forms of income and be able to demonstrate ability to provide for the needs of the [C]hildren.

6. Participate in an Agency-approved parenting program, following all recommendations and providing proof to the Agency.

7. Participate in an Agency-approved domestic violence program and provide proof to the Agency.

8. Maintain regular contact with Agency staff and sign all releases as requested.

Orphans' Court Opinion, 1/27/25, at 3 (citation omitted; capitalization modified).

On March 26, 2024, the guardian *ad litem* (GAL) for Children, Deanna L. Heasley (Attorney Heasley), filed a motion for the appointment of separate legal counsel for E.M.B. and J.G.B.,[3] based upon a possible divergence between their best interests and legal interests. The orphans' court subsequently appointed separate legal interests counsel for E.M.B. and J.G.B.

The orphans' court conducted the termination hearing on July 9, 2024. On July 11, 2024, the orphans' court filed orders terminating Father's parental rights as to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). Father timely filed separate notices of appeal from the orphans' court's orders.

Counsel for Father contemporaneously filed Pa.R.A.P. 1925(a)(2)(i) concise statements challenging termination under 23 Pa.C.S.A. § 2511(a) and (b), and indicating his intention to withdraw pursuant to **Anders**. Following a remand, the orphans' court issued its Opinion on February 4, 2025. **See In re Adoption of A.C.B.**, 2024 Pa. Super. Unpub. LEXIS 3, 2025 WL 26056 (Pa. Super. filed Jan. 3, 2025) (unpublished memorandum) (remanding for new opinion).

_____

[3] Attorney Heasley did not seek separate legal counsel for A.C.B., who was 16 months old at the time of the termination hearing.

Preliminarily, Counsel seeks to withdraw from representing Father pursuant to *Anders* and *Santiago*. *Anders* and *Santiago* require an attorney seeking to withdraw to (1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; (2) file a brief referring to anything in the record that might arguably support the appeal; and (3) furnish a copy of the brief to the appellant and advise him of his right to obtain new counsel, or file a *pro se* brief to raise any additional points the appellant deems worthy of review. *Santiago*, 978 A.2d at 358-61.

In *Santiago*, our Supreme Court further addressed the briefing requirements where court-appointed appellate counsel seeks to withdraw from representation:

> [I]n the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361. Substantial compliance with these requirements is sufficient. *Commonwealth v. Wrecks*, 934 A.2d 1287, 1290 (Pa. Super. 2007). After establishing that counsel has met the antecedent requirements to withdraw, this Court makes an independent review of the record to confirm the appeal is wholly frivolous. *See Commonwealth v. Dempster*, 187 A.3d 266, 272

(Pa. Super. 2018) (*en banc*) ("[P]art and parcel of **Anders** is our Court's duty to review the record to insure no issues of arguable merit have been missed or misstated.").

In his petition to withdraw, Counsel certifies that after a thorough review of the record, he concludes Father's issues are wholly frivolous. Petition to Withdraw, 9/20/24, ¶¶ 4-5. Counsel states he has furnished a copy of the **Anders** brief to Father and advised Father of his right to obtain new counsel or file a *pro se* brief to raise any additional points Father deems worthy of review. **See id.** ¶ 7. Counsel's **Anders** brief provides a detailed summary of the procedural history and facts of the case and asserts two issues that could arguably support the appeal. Counsel states his reasons for concluding the appeal is frivolous. Based on the foregoing, we conclude Counsel has substantially complied with the requirements of **Anders** and **Santiago**.

The **Anders** brief identifies the following two issues for our review:

1. Did the orphans' court commit an abuse of discretion or error of law when it concluded that the Agency established sufficient grounds for termination under 23 Pa.C.S.A. § 2511[(a)]?

2. Did the orphans' court commit an abuse of discretion or error of law when it concluded that termination of [Father's] parental rights was in the Children's best interests under Section 2511(b)?

**Anders** Brief at 4 (capitalization modified).[4]

---

[4] We decline to deem the issues waived, despite deficiencies in the Pa.R.A.P. 1925 concise statement.

We review the termination of parental rights for an abuse of discretion. *See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In the Int. of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court

- 7 -

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted).

The standard of "clear and convincing" evidence is defined as "evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Int. of R.H.B.*, 327 A.3d 1251, 1256 (Pa. Super. 2024) (quotation marks and citation omitted). Finally, this Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

We examine Father's challenge to the termination of his parental rights pursuant to Section 2511(a)(2), which provides as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

**(2)** The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, … 797 A.2d 326, 337 (Pa. Super. 2002).

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted) …. Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at

- 9 -

340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted;formatting altered).

It is well-established that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Regarding the definition of "parental duties," our Supreme Court has explained:

Our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in a child's life. Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (citations, some quotation marks, and brackets omitted).

In his *Anders* brief, Counsel recognizes that Father

- 10 -

demonstrated only minimal compliance with the court[-]ordered permanency plan. The mandates were clear and there is no evidence of record that [Father] was unaware of them. [] OCY's caseworker testified that [] Father did not accomplish any of the goals in the case.

*Anders* Brief at 17 (capitalization modified).

In its opinion, the orphans' court summarized the evidence presented

at the termination of parental rights hearing:

OCY presented numerous exhibits and testimony of seven witnesses to the court in support of [its] petitions to terminate both Mother and Father's parental rights. At the outset of the [hearing, c]ounsel for OCY introduced the following exhibits without objections:

1. Certified Juvenile Dependency Docket

2. Prior Juvenile Dependency Documentation (In the Interest of A.B.)

3. Prior Juvenile Dependency Documentation (In the Interest of E.B.)

4. Prior Juvenile Dependency Documentation (In the Interest of E.B. & J.B.)

5. Juvenile Dependency Petitions (In the Interest of E.B., J.B., & A.B.)

6. Juvenile Dependency Court Orders (In the Interest of E.B., J.B., & A.B.)

7. Juvenile Dependency Court Summaries (In the Interest of E.B., J.B., & A.B.)

8. Psychological Evaluation by Dr. Peter von Korff [(Dr. von Korff) ([regarding Father])

9. Urinalysis Screen Results ([Mother])

10. Urinalysis Screen Results ([Father])

11.    Adult Probation Urinalysis Screen Results dated 10/25/23 ([Mother]) and 12/13/23 ([Mother] and [Father])

12.  Protection from Abuse Documentation at Docket Nos. 16371-2023, 16321-2020 & 16201-2014)

13.  Certified Criminal Docket ([Mother]).

Exhibit 9….  Father's urinalysis screens are summarized by Exhibit 10, revealing 11 negative results, 29 no-show appointments, one instance where Father could not produce a sample, and five (5) positive results, including three (3) for Methamphetamine and Amphetamine, on November 17, 2023, and January 18 and 19, 2024.  [OCY's] Exhibit 10, Urinalysis Screen[.]

Orphans' Court Opinion, 1/27/25, at 13.

The orphans' court summarized the testimony presented by Dr. von Korff:

Dr. [] von Korff … testified "in an expert capacity in the area of psychology with a focus on parent-child attachment orientation." N.T.[, 7/9/24, at] 12.  Dr. von Korff testified to Father's "history of methamphetamine and alcohol abuse," Father's rehabilitation history, and Father's mental health history, including "diagnoses of bipolar, and a history of suicidal thoughts and gestures[.]" [***Id.*** at] 14. … Dr. von Korff testified Father would "[need] to be stable and drug free" to care for his sons, E.M.B. and J.G.B.  ***Id.***

Dr. von Korff administered the "Minnesota Multiphasic Personality Inventory" during his interview with Father.  [***Id.*** at] 14.  Dr. von Korff stated that Father provided "very frank self[-]descriptions of problems and difficulties in life.  So, [Father] got low scores on scales that have to do with withholding information, and then very high scores on almost every scale of pathology that the instrument presents," with many "scores … in the 99th percentile."  [***Id.*** at] 15.  Dr. von Korff testified that "the take[]away from this test is that [Father's] challenges are so profound that it's reasonable to suggest that he would have no idea about where to start [to address them]."  [***Id.*** at] 16.  While Dr. von Korff stated Father is "able to acknowledge that his life is … in huge difficulty," Dr. von Korff elaborated on the significance of Father's mental issues by

- 12 -

stating "the degree and the variety of the problems that [Father] was facing would preclude him from making significant gains simply on his own." [*Id.* at] 16-17.

Orphans' Court Opinion, 1/27/25, at 14. Dr. von Korff further testified that

Father's assessment profile "suggests that he doesn't learn from mistakes. He doesn't learn to delay his impulses. He doesn't learn to measure his response to others. And he's sort of always catching up." N.T.[, 7/9/24, at] 17. Dr. von Korff confirmed OCY's assertion that treatment for Father "would need to be consistent and stable for a long period of time" for any progress to be made; also, Dr. von Korff stated that Father would "absolutely" need to remain free of drug and alcohol use during this treatment. [*Id.* at] 18-19. OCY then questioned Dr. von Korff about Father's "adult attachment interview," and Dr. von Korff recounted the results, saying [Children] "are insecure in their attachment" to a parent that is "very likely to be [very] inconsistent" due to how the parent processes their own childhood. [*Id.* at] 21. Dr. von Korff stated Father "slipped repeatedly into a sense of the past being present" when recounting the domestic violence Father witnessed as a child. [*Id.* at] 22. Dr. von Korff then confirmed that Father would "need significant[,] consistent[,] at least weekly counseling to resolve these issues in order to be a safe and stable caregiver." [*Id.* at] 22-23.

Dr. von Korff … testified that Father and E.M.B. have "an inverted parent-child relationship" or "upside-down relationship where [E.M.B.] is providing [Father] with a sense of security and belonging." [*Id.* at] 24. Dr. von Korff elaborated that "[a] child in this position doesn't have a parent who provides a safe haven or a secure base from which to operate. And it's a child who has to bear the burden of the parent's insecurity and uncertainty in life." [*Id.* at] 25. Dr. von Korff then testified to E.M.B. witnessing Father and Mother's domestic violence. Reading from his report, Dr. von Korff stated:

And I wrote the words of [Father]. *I'm punching the walls, and [E.M.B.] wasn't right there, but he could hear it. And [Mother] … would grab him and hold him while I was screaming, like using him as a shield.* So, in other words, the child has been placed between the parents as a sort of ploy in the midst of a domestic scene.

- 13 -

[*Id.* at] 27 (emphasis added to words of Father).

Dr. von Korff then stated that, since Father had not seen [Children] since December 2023, this lack of contact is "a very significant rift" in the parent-child relationship. [*Id.* at] 29. Dr. von Korff stated [Children] "will, at best, be confused, and, at worst ... will be traumatized by that sort of abandonment" if suddenly reunited. [*Id.* at] 29.

Orphans' Court Opinion, 1/27/25, at 14-27 (emphasis in original).

In addition,

[w]hen asked by Attorney Heasley why Father found incidents of E.M.B.'s agitation "adorable," Dr. von Korff stated that it is indicative of "some disconnect between [Father] … and his responsibility as a parent," and further explains that Father reaches a "sort of ... identification with the child" in a manner similar to his own agitation and mental instability. [*Id.* at] 37. Attorney Heasley then asked Dr. von Korff about Father "[walking] away and [smoking] a cigarette" after calming E.M.B. from an emotional episode, with Father additionally saying "I was like, have somebody else watch him." [*Id.* at] 38. Dr. von Korff explained these statements as Father saying "maybe with guidance and with instructions I can perform a parenting role like this on occasion, but don't expect me to do it on a regular basis, because I simply can't." [*Id.*]

Dr. von Korff further agreed with Attorney Heasley when saying Father's issues are "a protracted problem," and stated that, from [Children's] perspectives, numerous dependency placements will "not serve them well in terms of their sense of general security and well-being." [*Id.* at] 50. Dr. von Korff confirmed that, due to the "very significant rift" created by Father not being a part of [Children's lives] since December 2023, that it "would be in [Children's] best interest to sever [the] unhealthy relationship to allow them to further a stable and healthy [relationship] with the current caregivers." [*Id.* at] 29-30.

Orphans' Court Opinion, 1/27/25, at 16.

- 14 -

The orphans' court further summarized the testimony of OCY caseworker Nicole D'Amico (Caseworker D'Amico). According to the orphans' court,

> Caseworker D'Amico outlined a "family group decision-making meeting" which "did not end well," and included "[Father] ... [walking] out three separate times because he was so frustrated with the situation and at [Caseworker D'Amico]. [Father] was very verbally aggressive towards [Caseworker D'Amico] during that meeting." [N.T., 7/9/24, at] 80-81.
>
> … Caseworker D'Amico then testified to [a] meeting where OCY explained to Father that "the Agency [would be] recommending continued placement at the October [25, 2023] hearing…." [*Id.* at] 82. Caseworker D'Amico explained that Father "became belligerent towards Agency staff," "threatened to punch a deputy in the face," and [then] stated he "would need to be hospitalized for his mental health if [Children] were not returned to his care at that next hearing." [*Id.* at] 82-83. Father also "punched and broke a bookshelf at [this] meeting." [*Id.* at] 83.
>
> Caseworker D'Amico testified to Father's substance abuse relapse issues as well, confirming Father "tested positive for methamphetamines and [methylenedioxymethamphetamine (MDMA)], and admitted to methamphetamines on December 10th of [2023]." [*Id.* at] 84. Father further tested positive "for amphetamine and methamphetamines on November 17th of [2023]." [*Id.* at] 85. Father explained that he had been given the methamphetamines by a coworker, which was "the most explanation that he gave [Caseworker D'Amico]." [*Id.*] Father had been "getting weekend visits" with [Children] during this period, and Father "reported that the weekend visits were stressing him out. And that was the only explanation that [Caseworker D'Amico] had been given …." [*Id.*] Caseworker D'Amico confirmed that Father had been using Methamphetamines "to cope with the stress of parenting." [*Id.*]
>
> Caseworker D'Amico stated that, because Mother "[had] not addressed her sobriety, and... remained an unstable parent," the Agency responded by "[making] every effort to reunify [Children] with [Father]." [*Id.* at] 86. Despite being allowed "some extended visits … [including] overnights," Caseworker D'Amico

- 15 -

confirmed that Father "was using methamphetamine and going back to his old ways of substance abuse." [*Id.*]

Caseworker D'Amico testified to recommending the [dependency] court change its goal to adoption at the February 26, 2024, permanency review hearing. … Caseworker D'Amico stated that Father, though he was "close to reunifying [with Children] … in December[,] … self-sabotaged by using [methamphetamines] again[,] and then not following through with his mental health treatment." [*Id.* at] 89. Caseworker D'Amico confirmed that she felt [Children] would not suffer "any significant emotional damage or negative impact" if the [orphans' court] terminated … Father's parental rights and felt termination would "best serve [Children's] needs and welfare." [*Id.* at] 89-90.

Orphans' Court Opinion, 1/27/25, at 19-21. Significantly,

Upon examination by Attorney Heasley, Caseworker D'Amico provided further detail about the at-home visits with Father:

[Father] had spoken to [foster parent] (the adoptive resource) regarding, if they were reunified, to send [Children] to her home on the weekends just due to the fact that he had been stressed out with the amount of need[s] that [C]hildren had, and feeling just stressed out in general about [C]hildren being with him when they were there for the weekend visits that lasted overnight

[N.T., 7/9/24, at] 92. When asked if this conversation was concerning, Caseworker D'Amico stated it was, elaborating that if Father was going to reunify with [Children], "then he should be able to take care of them at all times, regardless of the time or day or work schedule." [*Id.*]

Caseworker D'Amico then testified to the November 19, 2023, incident where "[A.C.B.] had been dropped on her head," saying that, since this incident was close in time to Father's "positive methamphetamine result," it was "very concerning to the Agency." [*Id.* at] 93. E.M.B., in addition to his ADHD diagnosis, showed "extreme trauma symptoms" according to Caseworker D'Amico, including becoming "very anxious when speaking about his parents," anxieties "regarding natural disasters … fires and flooding," and a "point where [E.M.B.] was preoccupied with

death" and drawing pictures of "fires [and] disasters…." [*Id.* at] 94-95.

Caseworker D'Amico testified J.G.B. would "often ... get angry; disruptive; nonstop talking…. I know [J.G.B.] was hitting his sister (A.C.B.) at one point." [*Id.* at] 94. Caseworker D'Amico stated that she felt [Children] were "making improvements, especially with the decrease in the visitation" of Mother and Father. [*Id.* at] 95. Caseworker D'Amico also testified that she was present when Father punched the bookshelf, and stated that when she "did not give him a gas card," Father "punched his van twice," and was otherwise "verbally aggressive towards [Caseworker D'Amico]" in court hearings. [*Id.* at] 107.

Orphans' Court Opinion, 1/27/25, at 21-22.

OCY Caseworker Bridgette Gerber-Winschel (Caseworker Gerber-Winschel) testified regarding Father's aggressive behavior with OCY staff, stating that Father specifically threatened two caseworkers. N.T., 7/9/24, at 118. Caseworker Gerber-Winschel testified that Father stated, "with you not talking to us, there's literally no incentive for me not to go and be reckless," and "if [Father] didn't wake up tomorrow, it would be fantastic." *Id.* Father did not testify at the hearing.

The evidence overwhelmingly supports termination of Father's parental rights pursuant to Section 2511(a)(2). As the orphans' court opined,

Father's history of mental illness, domestic violence, and substance abuse, combined with his inability to address these concerns, reveal a course of action that is not conducive to raising [Children] …. Father's two … involuntary commitment warrants show that he is unable to maintain mental stability to even be proximate with [Children]; it is worth noting again that Father had no visits with [Children] during these periods. As for Father's visits, his inappropriate discipline of J.G.B. and dropping of A.C.B. show instability and inability to keep [C]hildren safe in his care.

> Further, given Dr. von Korff's account of Father being unable to mentally process E.M.B.'s tantrum, "[walking] away and [smoking] a cigarette", with Father additionally saying "I was like, have somebody else watch him," it seems clear that Father's mental instability critically impedes his ability to address the mental and emotional needs of [C]hildren, let alone his own mental health. N.T.[, 7/9/24, at] 37-38. This, combined with Father's domestic abuse history involving Mother, show[s] Father's "repeated and continued incapacity, abuse, [and] neglect" which has caused [Children] "to be without essential parental care …." 23 Pa.C.S.A. [§] 2511(a)(2). Finally, given Father not completing[,] or engaging with[,] the [behavioral health services], and his continued substance abuse, it is clear these issues "cannot or will not be remedied by [Father]" at this point. ***Id.*** Therefore, involuntarily terminating Father's parental rights based on 23 Pa.C.S.A. [§] 2511(a)(2) is proper.

Orphans' Court Opinion, 1/27/25, at 28-29. The orphans' court's findings are supported in the record and its legal conclusion is sound. Termination of Father's parental rights under Section 2511(a)(2) is supported by the evidence.

If the orphans' court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). Section 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child[,]" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b).

The question under Section 2511(b) is not merely whether a bond exists. As our Supreme Court has explained, **orphans' courts must**

- 18 -

**determine whether the child has a bond with the biological parent, the nature of that bond, and the effect that severance of the bond would have on the child.** *In the Int. of K.T.*, 296 A.3d at 1109. Moreover, the parent-child bond inquiry is but one factor to consider under a proper Section 2511(b) analysis. *Id.* at 1111. "[B]ond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109.

In determining whether termination serves Children's needs and welfare, the orphans' court considered the above-referenced testimony, as well as testimony from OCY Caseworker Gerber-Winschel.

> Caseworker Gerber-Winschel testified [] that she has been overseeing the services for the Children while in [foster parent's] care; E.M.B., according to Caseworker Gerber-Winschel's testimony, has been "doing fantastic" and "does not have any tantrum behaviors in school." N.T.[, 7/9/24, at] 111. J.G.B. similarly was "doing great in the daycare setting," and Caseworker Gerber-Winschel stated his "tantrum behaviors [had] come down significantly" due to placement and a medication adjustment. [*Id.*]
>
> Caseworker Gerber-Winschel testified to a home visit with [foster parent] and [Children], and stated that E.M.B. asks if he will "still be able to be adopted" when Caseworker Gerber-Winschel discusses court proceedings. [*Id.* at] 112….
>
> Caseworker Gerber-Winschel, on direct examination from the Agency, stated that granting the petitions for termination of [Mother's] parental rights would "serve [C]hildren's best needs and welfare." [*Id.*] Later, on cross-examination …, Caseworker Gerber-Winschel stated that, since [the foster parent] is "the most consistent parental role in their lives," there would be no "detriment to [Children] if the bond between [Father and Children]

was severed." [**Id.** at] 116. Caseworker Gerber-Winschel later stated that [foster parent] "has gone above and beyond to meet [Children's] heightened psychiatric and behavioral needs, as well as their physical needs." [**Id.** at] 117.

Orphans' Court Opinion, 1/27/25, at 22-23 (capitalization modified).

The orphans' court determined termination of Father's parental rights to Children under Section 2511(b) is warranted:

[Children's] "developmental, physical and emotional needs and welfare" have been addressed far better while they have been in [foster parent's] care. 23 Pa.C.S.A. § 2511(b). E.M.B. and J.G.B. have shown marked improvement since being placed with [foster parent] …. Further, given E.M.B.'s diagnosis of ADHD and J.G.B.'s diagnosis of "disorders of social functioning with onset specific to childhood and adolescence and reactive attachment disorder of childhood," placing [Children] back with Mother and Father and expecting the same positive trajectory is improbable. [OCY's] Exhibit 7, Juvenile Dependency Court Summaries (In the Interest of E.B., J.B., & A.B.)—Permanency Review Hearing, October 25, 2023, p. 6. These additional behavioral considerations of child-rearing make [foster parent's] efforts even more laudable. Therefore, the [orphans' court] finds that 23 Pa.C.S.A. § 2511(b) will be satisfied by the involuntary termination of … Father's parental rights.

Orphans' Court Opinion, 1/27/25, at 29-30. The orphans' court's findings are supported in the record, and we discern no abuse of discretion or error in its legal conclusion. Father's challenge to termination pursuant to Section 2511(b) merits no relief, and is frivolous.

Our independent review further discloses no non-frivolous issues that could be raised by Father. Accordingly, we grant Counsel's petition to withdraw and affirm the orphans' court's decrees involuntarily terminating Father's parental rights to Children.

Petition to withdraw granted.  Decrees affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/19/2025